Case number 21-1266 et al. Central Hudson Gas & Electric Corporation et al. Petitioners v. Federal Energy Regulatory Commission. Mr. Tompkins for the Petitioners, Mr. Kaiser for the Intervenors for the Petitioners, Mr. Perkins for the Respondents, Mr. Strauss for the New York State Public Service Commission, Mr. Tabat for the Respondent Intervenors. Good morning, Mr. Tompkins. Good morning. May I please report. Jason Tompkins for Petitioners, the New York Transmission Owners. With me at council table is my colleague, Andrew Tunnel. I'll endeavor to reserve 3 minutes for rebuttal. Transmission owners must own and operate system upgrades required by generator interconnections on a non-profit basis. Due to a 1,200% increase in the number of generator interconnection requests within NISO in the years leading up to this filing, the transmission owners requested from FERC the ability to earn a return on new upgrades going forward. They did this through two alternative filings that each independently would lead to the same end result. The first was a section 205 filing, a request to amend the tariff. The issue before this court on that issue, on that order, is one of contract meaning. Section 310 of ISO agreement reserves the transmission owners' rights to seek costs plus a reasonable return on investment. The easiest way to determine whether the transmission owners' filing fell within those words is to look at exactly what they requested. Joint appendix page 13 shows a red line of the tariff amendment, which requests, and I quote, a facility services agreement that provides for the transmission owners' recovery of its funded costs plus a reasonable return on investment. Thus, by the plain terms, what the transmission owners requested falls precisely within the same terms as what they reserved in the ISO agreement. I'm going to ask you about that 310 issue. You have not put a dollar figure on any past costs that you're trying to recoup, and you have not put a dollar figure on any future costs that you're trying to recoup. Is that, I know you may think that that isn't important, but is that correct? We did put a dollar figure on some past costs. Where is that? In Mr. Novak's testimony, where he discusses the five types of risks that the transmission owners are subject to by ownership of all transmission facilities, including the system upgrades. He gave examples of NERC penalties, of Public Service Commission penalties and negative rate adjustments, of cybersecurity penalties. And he did put a dollar figure on all of those things. Those are at Joint Appendix 108 through 116. Okay, if I'm trying to figure out the additional risk and the cost, and imagine I have an air conditioning cost, and there's a heat wave, my air conditioning cost goes up, the expense goes up. But we wouldn't call the heat wave a cost, right? We would just call it a cause of the cost. Do you see where I'm going with this? That's correct, and I think one of the examples given in the testimony from Mr. Novak of that type of risk is the flip side of that, which is instead of a heat wave, a cold snap. Like the cold snap that occurred in Texas in 2021. That is a risk that resulted in hard costs. But doesn't that just illustrate the difference between a risk and a cost? So, again, the cold snap is not a cost. The cold snap is a cause of cost. Not every cause of a cost is itself a cost. That's true, but I think the important thing there is that once those risks come to fruition, they result in a cost that the investors have to bear. And so taking this back to the fundamentals of Bluefield and Hope, utilities, public utilities, are entitled to earn a return on all property used in public service. And investors are investing with acknowledgement that their return satisfies their desire that the risks are covered. And here we have a large category of risks that are not currently covered in the return on investment that the investors are looking at. So you would call the cold snap a cost? We would. Under this provision, we would say that it is a cost. And I believe that Ameren recognized that these risks have real costs in the real world. Do you need to win on that point? And that's a counterintuitive, possibly counterintuitive understanding of cost. But it's not a cost, it's a risk. And if you're driving up the risk, you should get a greater rate of return. So you have to account for this problem either through the cost route or the rate of return route. So two points on that, Your Honor. No, I don't think we have to win on risk being perfectly equal to cost. The first reason is what I mentioned before with Hope and Bluefield. Even absent risks that Hope and Bluefield established under the regulatory compact, public utilities should earn a return on their property that is committed to public service. Here, even though they did not initially fund the generator system, the system upgrades required by the generator request, they were conveyed to our clients and our clients do own them. It's now their property that's being used and they're not earning any sort of profit on that. So fundamentally, it violates the principles of Hope and Bluefield. But secondly, there's also the other part of the 310 reservation, which is return on investment. And that fits very neatly with what I think the transmission owners are trying to do here. They were trying to add the system upgrades into rate base and return on investment. Is that really fair? So it seems to me what FERC says is that what you're actually trying to do is change the rules so you can make new investments by now funding the system upgrades that you can't currently fund. And one thing this filing reservation provision doesn't allow you to do is change the rules to allow you to make new investments. So where where does that argument go wrong? I believe that's a circular argument. The return on investment would be meaningless if we can't request permission to make the investment. You can absolutely. Well, I think one thing you could definitely do is say, make a filing that says for investments we've already made, you're not getting a reasonable return on investment and it needs to be increased. But what you can't do, FERC is saying, is ask for permission without getting consent from the ISO under this filing provision to allow you to make new investments. I think if we were to make that first filing, your honor, FERC would say it would violate the prohibition on retroactive rate making. I don't believe that we have the ability to recoup any of the costs or compensation for any of the risks for system upgrades that were implemented prior to our filing section. They say repeatedly in the orders and the briefs that you could make a filing arguing that the risk assessment built into your rate of return is insufficient. They say we can make a filing to adjust the return on equity ramp on it. That's correct. That actually shows that inconsistency shows why they're wrong about our filing right to begin with. The section you're talking about, the advice, I'll call it, the FERC gave is primarily in paragraph 69 of the rehearing order. I believe that's Joint Appendix 836, and it states, as your honor just paraphrased, that to the extent the transmission owners believe returns are inadequate to compensate them for the enterprise-wide risk presented by owning, operating, and maintaining their entire transmission system, which includes system upgrades, they retain the right to file under Section 205 of the FBA to seek to modify their base ROEs. ROI, return on investment, the words used in the reservation of rights, is a mathematical formula. That's set forth in Joint Appendix 8485. ROE is a variable within one of the factors of ROI. So, FERC is saying we could request to adjust one component of ROI, the return on equity component, but they're saying we can't adjust the other variable, the rate base. We believe that inconsistency shows that the transmission owners had the filing rights. Whether it's in ROE or in the rate base, the filing right was there. The fact that FERC believes it should be in ROE instead of rate base may affect the ultimate analysis if FERC were to address the merits of the proposal, but it doesn't affect the transmission owners' rights to ask for that return in the first place. Why can't, put aside the question about retroactive rate, just conceptually, why can't they, why can't one solve the problem you're facing by adjusting ROE? Your theory is the enterprise is becoming more risky as the transmission owners are forced to undertake all these additional responsibilities, and if they can't expand the rate base, there's more risk and no greater return. You could solve that problem either by expanding the rate base or expanding the return on equity to the people who are bearing the risk. So, I'll say it's possible, it might be possible to compensate in that way. I'll tell you why we think it's not the best solution, but before saying that, I'll just point out that whether it's the best solution or not, we don't think affects the threshold issue of whether we have the right to ask for it. And we wish to have that debate at FERC, but this was a new theory. This ROE theory was brand new in this proceeding. We didn't get the opportunity to engage with FERC on which of those things is best, because they rejected us at the threshold question of whether we can even ask for it. So, it doesn't affect that, but we believe that the ROE solution is an entire mismatch with the actual risk, because ROE is designed to encompass risk related to the rate base. That's why it's multiplied by the rate base to give that return. So, adjusting the ROE to account for risk outside the rate base creates a situation where the facility contributing the risk, the new system upgrade, isn't in the rate base. It's contributing zero to the rate base. This seems like sort of the core issue on the Section 206 claim, and FERC says in its orders that the enterprise-wide risk assessment does exactly what you say it doesn't, that it is a measure of the overall risk posed by the enterprise as a whole, including system upgrades that aren't in rate base. And it seems like you claim the opposite, but I want to know what the basis is for that. Is it anything more than the logic that you just set out? Is there a document somewhere that says risks posed by upgrades not in rate base are not considered an enterprise-wide risk? No, at this point, it's primarily that logic, because we never got to step two, even in the 206 order. Speaking of 206, 206 has two different steps. We have a similar argument as we have to 205. Step one requires that FERC conclude or assess whether the existing rate is unjust, unreasonable, or unduly discriminatory. It's only at step two that FERC decides what's the best replacement rate. The problem here is that FERC collapsed the two and said, because we believe that these costs or risks can be accounted for in return on equity, we don't think you've shown that the existing rate is unjust, unreasonable, or discriminatory. The problem with that, though, is that whether the problem, whether future system upgrades, the risk of future system upgrades can be handled through ROE is that currently it's not. The evidence that we have in the record from Mr. Novak is that our current ROE does not account for the risk of this. Based on the fact that Ameren concluded that these risks are real and accept the economic logic of this class of risk, and they're currently uncompensated, they're not in rate base and they're not in ROE, means that the existing rate is unjust. That's the key question. What's the evidence that they're not currently compensated? Mr. Novak, I can get for it. Is testimony at 649 to 650? I'll have to confirm the pages on that. If I have any time left for rebuttal, I can get that for you. Yes, Mr. Novak testified that these risks are not currently accounted for in ROE. In our rehearing petition, I believe it might be page 14 of our rehearing petition. I don't know the JA site offhand. We also explained that our current transmission rate was developed before the pro forma interconnection system even existed. It couldn't possibly account for these risks. Under 206, we believe it's step one. Because the risks are real and because they're not currently compensated in either rate base or ROE, FERC should have moved on to step two. Then we can have the debate with FERC that you're asking about, Judge Garcia, about whether ROE is better or transmission underfunding is better. Suppose we agree with you on the threshold waiver question and you win the 205 piece of this. And suppose also that when we think about the 206 piece of this, we agree with you that FERC didn't adequately explain what I'll just call the Ameren problem. Take those two things as a given. They still, in the 206 order, say something else, which is you can solve your problem in the way I was suggesting, which is making a 205 filing to seek a greater rate of return. That would seem to be a live issue on the assumptions I've asked you to accept. Why isn't that an independent and adequate ground to support the 206 order? And put aside the ancillary implementing amendments, just on the core 206 point. The core 206 point, I think it goes back to what I said a second ago, which is the fact that FERC believes there is an alternative to seeking it doesn't mean that the existing rate is just and reasonable. And under this court's decision in Amera, Maine, FERC has to make that threshold decision about whether the existing rate is unjust and unreasonable. And for the reasons I've stated a minute ago, we believe that FERC's decision that it is, is arbitrary and capricious and without substantial evidence. We had evidence that they're not currently compensated. And under that framework. It's a weird 206 where you're filing a 206 complaint, attacking your own tariff. Just trying to process it. There were two alternatives trying to accomplish the same thing. As I said at the beginning, these are alternatives. So we believe that if you grant the petition on the 205 issue, you need not reach the 206 issue. And FERC would have to determine whether the transmission owner's proposed rate is just and reasonable. I mean, you've challenged both orders. And if you win on 205, we still have to deal with your 206 challenge. Yes. And we believe those should be vacated and remanded. But I was just pointing out that I think that you could reach one and not the other. Do we have to deal with the 206 if we agree with you on the 205? And so we agree with you on the 205 and it goes back to FERC. And you get to argue with FERC about whether your new proposed tariff is just and reasonable. Let's say you convince them, then that would move the 206 issue, right? Yes, we believe it would. We believe you only have to reach 205. At that point, FERC would have to determine whether our proposal is reasonable. And even if FERC's proposal is also reasonable, as FERC has pointed out, there are multiple ways to seek compensation. Anything else? The government makes a big deal that you don't disclose these risks to investors. Is it true you don't disclose them to investors? That is not true. Mr. Novak pointed out that the parent companies, the publicly traded affiliates of our clients, do in fact disclose these categories of risk. But recall, these are prospective risks. They're current risks with the smaller portion of nonprofit appendages that the clients are operating. But this filing is prospective only. This was meant to deal with that 1,200 percent increase that was requested in 2019. It's going to more than double the number of nonprofit appendages within the system. Thank you. We'll give you a moment. Mr. Kaiser, welcome. Thank you. May it please the court, William Kaiser for the intervener supporting the petitioners. FERC's enterprise-wide risk theory creates a dangerous precedent. The left to stand will completely undermine the cost-of-service rate-making models established by the Supreme Court and Federal Power Commission versus HOPE. FERC's theory would require investor-owned utilities to own and operate certain portions of their business as a nonprofit. So under this theory, when a generator decides it wants to interconnect to the system, the utility has to lend its expertise to assess that interconnection, determine what facilities are needed to be built, build those facilities, own those facilities, operate those facilities, maintain those facilities, and do so with no compensation. HOPE is not a great case for you. It says don't really look inside the black box of how the rate-making works. You just make a bottom-line assessment of whether the numbers are broadly reasonable. It does, but HOPE does establish a compensation mechanism, and here FERC is trying to take that completely away by denying the utility the opportunity to make the investment. That's how HOPE establishes that utilities are compensated, by being able to make that investment. And so here, the commission is trying to, with a slight of hand, deny the opportunity for investment. And so that is why it undermines HOPE. Do you think the only way to solve this problem is to put that investment into the rate base as opposed to just adjusting the rate of return? The problem with adjusting the rate of return, and I appreciate your question to counsel for the petitioners, is that two things. First, it results in a cost shift. So the ROE, when it is applied to rate base, when a higher ROE is applied to rate base under FERC's theory, it would go to transmission customers. Here we're talking about charging generator interconnection customers for the cost of their interconnections. So it goes to a different set of customers first. But more importantly, it also results, FERC's ROE methodology just isn't fine-tuned enough to be able to pick up the risk of particular classes of facilities. So it's a methodology that's good for adjusting overall risk to a business model as a whole, but not for particular classes of facilities. It's just not fine-tuned enough to do that. Sorry. So you're saying you adjust the return on equity, which allows you to charge the transmission owner to charge more, but that's getting passed through to the – To transmission customers. That's right. Because under the regular rate-making methodology, it goes straight to – the ROE itself goes to transmission customers. Here, the New York transmission owners are trying to establish the cost that would go to generators. Okay. Thanks. I'm out of time, but I'm happy to answer questions. Okay. Thank you. Thank you. All right. Mr. Perkins, whenever you're ready. May it please the court, Jason Perkins for the commission. There was a lot to respond to topside, but I think one of the things that I started out with would be the question about cost versus risks under Section 310A of the agreement. So the bottom-line question that FERC was trying to answer in this interpretive question was, was changing the investment rules for system upgrades, quote, necessary to recover all of their transmission owners reasonably incurred costs plus a reasonable return on investment. So in applying that provision, you have to find a reasonably incurred cost, and the word plus matters a lot in this phrasing because it applies to costs that you have to recover, actual dollars and cents, plus any reasonable return on investment that's associated with those costs. So what the commission was doing here was essentially looking to see whether or not there were dollars and cents at issue in this filing, and it was actually a policy-driven filing trying to change who incurs the investment. The ones who actually put money into this right now under the current system are the generators. The generators pay for their own facility, they pay for the interconnection facilities, the line that runs to the grid, and they also pay for the upgrades on the grid that we're talking about here, which are integrated with the rest of the system, which are, according to the petitioner's own words, virtually indistinguishable from the rest of their facilities, and they present the same risks that the rest of their facilities present. So I think in interpreting these words and understanding what the transmission owners wanted, the real thing at risk here was the returns they were already receiving on the rest of their system as a whole. That's the concern that a lot of the testimony gets into about negative revenue adjustments and penalties. The profit margin that they already receive might be eroded by those things because they can't necessarily recover some of those penalties and some of those problems from their customers. So they essentially need to protect their profits, and that's why they came in to make this particular filing. And FERC interpreted that as saying the problem is maybe you have a risk-return mismatch based on what you are currently earning, but that's an issue for the return on investment type of question. That was my instinct as well coming in this morning, which is they have a plausible explanation why they have an amateur problem, and you have a plausible response that you don't necessarily need to expand the rate base in order to solve. But now I'm a little less comfortable with that, hearing two concerns from your friends on the other side. One is that going down that path creates a retroactive rate-making issue, and two is the intervener's point that if you go that route, you're imposing the costs on the wrong set of customers. So what are your responses to those two concerns with doing this through ROE rather than rate-based? Right. So I think to take the second one first, who are the right set of customers to pay for these things, the risks are to the system as a whole, and there's nothing in the testimony that says that these risks are distinguishable for system upgrades themselves. I mean, my understanding, not as an engineer, but my understanding is if you looked at the system, you took a picture of the transmission facilities they have in New York and you handed them to an electrical engineer, they couldn't tell you which ones were system upgrades or which ones were part of their system. And so there's not really a difference in kind of the risk that's happening here. It's maybe an increment to the overall risk of the system, and the types of things they talk about are the same things they already face today. You think that's so – I mean, there's a cost causation principle, as you know. It seems perfectly coherent to say that all of these costs are being imposed by the new interconnection, and so the new interconnecting generator should bear those costs. Well, I think they do bear the costs in the sense that they are going to be the ones paying for this either way. So the capital costs are going to come from the generators eventually. It's just a question of whether or not a profit margin should also go to utilities, whether they should be the only ones to provide capital in the end for those types of upgrades. But in terms of why it's fair, I guess, that the rest of the customer base should pay, there's a general understanding, going back to Order 2003 in this area, that these are facilities that upgrade the grid generally, and so the actual usage of these facilities goes to everyone that takes service from the grid. And so in some areas of the country, you do have transmission customers essentially funding credits back to the generator for fronting the money for this. So it's not unfair for transmission customers to have some cost exposure. In the current system, which the transmission owners don't mention a whole lot, but it is true, they recover the operations and maintenance costs of these facilities from the general customer base. Because again, I don't think that they were determining which facilities are actually system upgrade, trying to have a separate line item for that. Okay. What about the first point? The first point again was? Let me see if I got it. Oh, about the concern if you do this through ROE, it's retroactive. Oh, in a case where- Changing the return for old investments based on risks and problems that are happening from this new upgrade investment. Right, yeah. So I think, I guess there's two things with that. One is, I don't think there are any examples specifically tied to system upgrades, so we don't have a loss that we're actually talking about. Like, a risk is a probability of a loss or a potential loss. So there hasn't been an actual loss that's been demonstrated specific to system upgrades that they've been, you know, had to face. Like, their profit margin hasn't been eroded. No, but I mean, big picture, right? The world is changing. They have to do large amounts of new upgrades because of this green energy initiative and that changes things. Right, I think that that changes things. I mean, an adjustment to their previous investments is going to be perspective. But it is hard to see how they are left holding an economic injury, a specific economic injury from this. I think it really doesn't move past the hypothesis stage of there being a problem here. And so, while there is a retroactive rate making constraint on what the commission could do in the future, it's not clear that, especially when they haven't valued any risks, if you look at the rehearing order, you see roughly paragraph 63 through 65. But if you haven't actually valued the risks, we don't know how much it's worth to you. And so, that's why it's a question of an overall enterprise type of risk. You get paid for the money you actually put into the system. You don't necessarily get paid for the money that other people put in the system. And that's a longstanding commission policy and their contributions in the construction agreements that you see referenced as well in the rehearing. You say the risks are hypothetical, but in Council's first answer to my question, he pointed to some penalties in the past that have had to be paid. Why is that a non-hypothetical real cost? Why is that not? Sure. I think it's certainly a real risk. But again, as the commission was explaining it, it's the type of thing a transmission owner already faces. And so, there's already a place in the rate making calculus to take into effect those types of risks that they might face a cost that they can't recover from customers. I thought his point was that these penalties would not have existed if it weren't for the system upgrades. So, the risk of them certainly exists today because they are applied to the transmission facility base generally. Like, all facilities that would be subject to penalties, these aren't different in kind from them. It's just the fact that the system is a little bigger. So, there's some risk today. There was always some risk. They argue the system upgrades increase the risks. You say, well, whether they increase the risks or not, that hasn't been borne out in a non-hypothetical concrete way. And they come back and say, yes, actually it has. We have had these penalties that we would not have had absent the system upgrades. I mean, I don't think that any of the penalties they actually point to are necessarily tied to system upgrades. If you look at the risk catalog they give you, a couple pages of kind of a summary of what the types of risks that they're talking about, they're not identifying anything specific to system upgrades themselves that have caused that. It's just a general possibility. Can you point to a FERC precedent that when it's calculating the return on equity, it has considered these types of uncompensated risks, regulatory, reliability, cybersecurity, environmental, operation? I don't know that there's a FERC precedent that explicitly walks through what those are worth, like, you know, what the values are and why the specific adjustment is being made for that. But they are the same types that we recognize generally as the transitioners being subject to. It would give me some comfort if you can give me some precedent where at least that has happened. And the reason is, you know, your argument I think relies a lot on, well, these shouldn't be in the rate base, but it's perfectly fine for these to be considered if the transmission owners ask us to add them into the return on equity. But if that's never actually happened before, then that seems like it might be sort of a false promise. Well, I think we're still in the relatively early stages of this concept in that I'm not sure that the concept was really talked about or understood much before maybe the hearing request that eventually led to the Ameren decision. So, I don't know that there's going to be a deep well for precedent on this particular issue when it comes to looking at it. And this is really the first case where we got into actual evidence about these types of risks. And how that would support my suspicion that maybe this actually can't be added to the return on equity because it's new. And because it's new, we don't know. It's an unknown. But your briefings just seems very certain that it can be. It seems like your argument depends on the promise that this can be considered in the return on equity contribution. Well, I think as the petitioners were saying, or one of the previous speakers was saying, that the return on equity adjustments for particular risks, it's not necessarily the type of analysis that lends itself to an exact line drawing between one risk and an ROE increment. If we did that, then we would have to have extremely complex types of formulas that look at each individual risk. And so, in general, we follow the HOPE standard, looking at enterprises with comparable risks. You look at their credit ratings, their rates of return, and then you look to see where these companies should be in that mix. And so, we have to look at it on a company-wide basis. That's how they raise capital. They don't raise capital for particular facilities. So, that's how the system and the economics actually work for the companies here. If I can zoom to like 10,000 foot level, but it does sort of inform a little bit of my skepticism about FERC's promise that, don't worry, we're not going to let you put it in the rate base, but we'll probably let you put it in the rate of return. Amarin strongly suggested that generator funding is unjust. Didn't go all the way there, but it strongly suggested. And then American Clean Power didn't do anything to suggest that transmission owner funding is unjust. It said there's a discrimination concern that was raised, and it wasn't reasonably explained why that concern wasn't legitimate, but it didn't kind of put any faith in the discrimination argument ultimately being a winner on substance. And so, coming out of those two decisions, Amarin and American Clean Power, I would have guessed that FERC was going to go with transmission owner funding when it was at issue. And if it was going to make the ISOs across the country uniform, it would make them uniform in favor of transmission owner funding. I think there's been a show cause order that suggests the exact opposite is what FERC has decided, that they're going to abandon transmission owner funding, which, again, Amarin came pretty close to saying is required, and American Clean Power didn't do anything to really criticize. And they're going to impose generator funding, which Amarin came pretty close to saying is unjust. I guess coming out of Amarin and American Clean Power and coming out of FERC's arguments in American Clean Power, I'm surprised. And that surprise leaves some skeptics. Okay. Yeah, I hear you. I think that the way that we understand the Amarin case, and we described this in the complaint order, I think it's paragraphs 31, 32, is that it recognized an argument that FERC failed to respond to. And so we had to take that argument seriously. And in this proceeding, there was actual evidence trying to put meat on those bones. Recognized and laid out in some detail and quite colorfully by Judge Silberman. Right, right. I have the same reaction as Judge Silberman. Right. But if you look, I mean, but if you look at the, and we're not trying to refight the Amarin order, because we're going to look at the Amarin proceeding, because we understand that these are serious concerns that the commission has to take seriously. That's why it's doing it in this case and looking at some of the similar issues in other regions as well on an ongoing basis. But the issue with treating Amarin as determining the issue generally is that there were some assumptions built into that analysis. One of the assumptions being that the risks and the size of facilities are material enough that it creates economic injury to the transmission owners. That's a provable case. That is susceptible to real world facts. And so I think it's reasonable for the commission, especially in line with this court's section 206 cases, to expect there to be some kind of real world evidence of a problem. And I think it states a fine hypothesis, but one of the things, and if you look at the dissent in Amarin, it basically says there isn't a lot of evidence in this record to say it's actually possible yet. And then if you look at the dissent on the Amarin hearing order from Commissioner Glick, it also says there's not really a whole lot of evidence of this. Then in this case, you get an actual look at the evidence, and it doesn't value the risks. It doesn't say that they've reported these particular risks to investors. And we don't get a clear sense as to what the actual dollars and cents problem is for the transmission owners. So we were treating it as an issue that they can bring back to us in the sense of needing more fine-grained return on equity analysis if they think that's possible. But at the end of the day, the- Can I just clarify something you just said? So you said there's no evidence they report these risks to their investors. By that, do you mean these types of risks associated with system upgrades in particular? Correct. Because conceptually, I understood, first to be saying, that these types of risks faced by the grid as a whole are accounted for in the ROE analysis. And so what we're discussing now is just whether there's a distinct dollar figure on that type of risk borne by system upgrades as opposed to the rest of the TOs. Right. Okay. And there's nothing to suggest that, in general, that the enterprise level of analysis is wrong. That, like, we need to be looking at particular facilities. That the enterprise level should take care of concerns that the risks that they have generally. And so if they were reporting those to investors, if there were credit rating issues related to this matter, then there would be an urgent need to do something. But they're fundamentally- I understood the point to be that these risks, whether they're to this portion of the grid- Yeah. They're the exact same kind.  Faced by the rest of the grid. And our enterprise-wide risk analysis looks at- it's not fine-grained. It's a blunt instrument. But you're looking- you consider these kinds of risks in the ROE analysis. Is that right? That's right. Okay. Yep. And what you are acknowledging today, essentially, is if they could show that the system upgrades- due to the system upgrades or otherwise, those risks are not adequately being compensated. They could make a filing with more evidence and raise their return on equity.  Okay. One of their arguments on this point, the Section 206 issue, is essentially we bore the burden of showing that this kind of risk is not compensated for. But we did. We met that burden with Novak's testimony. And he does say the determination of the authorized return is set by reference to the risks associated with investing in the rate base. And then the FERC orders essentially just say, no, it's set as to a whole. But it sounds like on both sides, there are just claims going out. What's the right way for us to think about the burdens and why shouldn't we be concerned that there isn't a FERC order out there that explains how this works? Right. So I think under the 206 analysis, their burden was to show the current system is economically unfair to them. And the way they chose to define what economic unfairness looks like is that they claim that we have an increment in risk of the same kind we already face. And so to FERC, that looks like a return on equity question. And when it comes to these sort of phrases of what it gets applied to and what it doesn't get applied to, that's where the idea of the contributions in a construction agreements example comes up. You're not entitled to return on every single facility that happens to be part of your system. The record here indicates these are facilities that are transferred over a nominal cost to the utilities. So they didn't put any money into these facilities for them to be built. So why would they be paid for an investment they didn't make? So I think there's a lot of issues related to just basic concepts that this type of theory has to encounter. And that's one of them. And so to make it work, to take into account these potential types of problems within the current framework, this looks like a return on equity issue for the investments they've already made, because that is the profit margin that is at risk when it comes to potential things that can go wrong in the future. I have two more questions. One, there's been discussion of these kinds of risks resulting in actual penalties. I don't remember seeing that argument in the briefing, but if that's true, wouldn't that be now an incurred cost that they could make a filing and make the case they've not been compensated for in their rate, seek an adjustment for that, or would FERC object to that? I think it depends on the type of penalty. Penalties aren't necessarily coverable in rates. It sort of depends on the circumstances. My understanding of the. But if it was more a more traditional cost, you know, one of the risks here is just failure of system upgrades. Right. And if something breaks, it costs a million dollars to fix it. They can make a 3.10 filing to recover that cost. That's right. I mean, and that is in our interpretation of that provision. That's what that is for, is to help them make sure that they get into their rates, the costs that they actually face in the types of responsibilities that are already assigned to them by the tariff, not to rearrange responsibilities, but to make sure that they are not left holding an expense that would otherwise be recoverable. That just isn't accounted for in the rates. So I think, you know, when you talk about these penalties and examples, it is a long set of testimony here, but we shouldn't confuse length with on point issues. The types of penalties they are talking about are ones that are generally faced again, as we've discussed. And I'm not sure that any of these specific examples relate to a system upgrade, specific facility failing or resulting in penalties. The last question was actually about the discriminatory rate issue. They argue that the fact that MISO and other operators, the TOs there are allowed to do this type of funding and they are not makes this a discriminatory rate. And I'm just I want to clarify what exactly FERC's response is, because in the brief, there seems to be maybe a categorical legal argument that disparate rates affecting different regions simply can't ever be discriminatory. Is that really the argument or is it more of a fact specific finding? I think it's a little more fact specific than that. I think the issue that FERC did reject the principle of the argument that you can look at one rate in isolation and say that just because another region has it, the lack of it in ours must be unjust and unreasonable. The only fact that they kind of help support that notion with is that system upgrades were increasing in their region. And so I think that FERC rejected the principle that you can just look at another region and say, I'll have what they're having. But it is this is a type of claim they make that is susceptible to evidence that could have been paired with other things. And so I don't think that there is not only there is that legal frontline legal issue. There is also just a failure to carry a burden that the normal Section 206 type of case as well. Thank you. Did you need to finish with your answer to Judge Garcia? I was just saying in joint appendix at 100 is where it talks about revenue losses for shareholders. Sometimes it sounds like when you're going back to the 205 issue, when you're telling us what costs mean in 310A, you're saying costs means investment. It doesn't mean expenses. Am I understanding that to be in the ballpark of your argument? So reasonably incurred costs would be expenses in the sense that if you look at the description in paragraph 22 of the rate order, that description, it talks about costs that are recoverable in rates that are just recoverable. So if we do think of it as expenses, then imagine I'm running a business and I have 100 percent likelihood of a one dollar expense next year. And I have a 10 percent likelihood of a 10 million dollar expense next year. The first one is certain. Second one, not certain. But isn't the second one a bigger expense? Well, I don't think that we're talking about particular magnitudes of dollars here. And I guess why shouldn't I think of the second one as an expense, a 10 percent likelihood of a 10 million dollar expense? That seems like an expense. And you just told me an expense is a cost. Well, I think that the hearing order does explain that costs you incur to mitigate risks or address risks are costs like they are recoverable. So if there's something the transmissioners can point to that they are doing to account for the risks that result in costs, those. They're saying it's a risk of an expense going forward. Right. And they say that's a cost. And if it's a cost, we get to make a 310A filing. And I thought a minute ago you were sort of saying, yeah, an expense and a cost are basically talking about the same thing. Right. Well, I think. I think the rate structure, the current rate structure allows them to get recovery of things that are operating expenses or capital expenses. So if you can think of your potential cost as going to be one of those two things and there's an obvious investment responsibility you already have that's tied to this. Then it's possible to think of this provision as covering it. The problem is, it doesn't relate to actual policy changes of the tariff. If you look at Section 3.03 of the agreement, that hands over all the rate filing responsibility to the system operator. Only this part of that. I think this is my last question. Sure. Two concerns that that just catches began with that were kind of captured from arguments made by the petitioner, the intervener. I thought one of your responses to him would be that those are new arguments raised or arguments, so we can't consider them. But is that fair? Or were they made of the briefs? Just reiterate it more. Which specific argument are you referring to? I don't think the word retroactive is gracious, maybe. So I think that there were things raised in the case about that, but it's not like a specific argument saying that the current system is creating a retroactive rate making problem. I don't know that that was fully developed. We're looking at the current economics of the system and whether or not the transmission owners are facing actual economic struggles. Maybe I'll ask that. It seems like if it's not in the blue brief or the intervener, you can't consider it. I would. I would think so. But that is an issue that has been tossed out in the general scheme. This type of I mean, generally speaking, their position is you have to solve the Ameren problem. A, you have to solve the Ameren problem one way or the other. B, we prefer a rate based solution to a return on equity solution, but they may argue. I mean, they're seeking relief one way or the other. Right. But I think the Ameren problem is actual capital attraction. That's the end point that the Ameren case is making. Assuming that the transmission owners there were correct, they were facing a capital attraction problem. There was an opportunity to put evidence of that here and it just didn't happen. So I think that once you get to the specific facts of these types of cases, that's where you get a full rates termination. And again, Ameren was a failure of the commission to respond to the argument in the first place. OK. Anything else? Thank you. Thank you. Thank you. Mr. Schuss, good morning. Good morning, Your Honor. So I make sure you can hear me clearly. Scott Sprouse for the New York State Public Service Commission. Meeting the goals of New York's 2019 climate law is going to require both new power plants and new transmission facilities to deliver their output. Under participant funding, which has been part of the New York rate design for 20 years, the developer funds the upgrades using the most cost effective financing available in the marketplace. Now, petitioners are attempting to eliminate it through a section 205 filing. They can't do that because they lack the authority to make that filing. What you have is a square peg round hole problem here. Agreement section 3.10 authorizes section 205 filings to recover costs that the transmission provider has incurred or to adjust the return applied to investments that the transmission owner has in fact made. Those rights are not implicated here. Petitioners have not identified costs they've incurred or investments that they have in fact made that they can't recover. What they're trying to do, and Judge Garcia, I think you had it right in your questioning earlier. They're trying to use this provision to change the rate design so that they can make additional investments on which they can then earn returns. But they can't get there from here to there. That's why they have to go to section 206. Section 206 fails because they simply don't have the evidence to support the burden right there to show that the existing... Let me get to 206. Let's just push a little. I understand your argument why they're not talking about costs. But the reservation in the tariff also lets them do a 205 filing to seek a reasonable return on investments related to services under the tariff. And the Commission has moved pretty far today towards saying there may be issues here, but they are related to return on investment. Correct. So why isn't this at least a litigable issue on the appropriate return on investment? And they might or might not win their 205 case before FERC, but... Oh, I think you misunderstand, Your Honor. I agree with you. They have a remedy here. Their remedy is to attempt to seek an increase in their return on investment. I'm not suggesting they can't file a case to change their ROE going forward if they want to do that. What I'm saying is you can't use the 205 route to change the rate design. That's what they're trying to do. They're trying to change the rate design so that they get the right to make investments that they currently cannot make. That's why they're here. They're here because they want the right to make an investment on which they can then incur or earn a return on. So what they've said is we're subject to all of these uncompensated risks. They don't quantify them. They don't actually show any evidence of real financial distress such as would be necessary to justify that kind of relief. They don't tell you that they're on credit watch. They don't tell you that their credit ratings have gone down. They don't tell you that their borrowing costs have increased or that they can't attract capital. They don't tell you any of those things. And by the way, this case was filed in December of 2021. It has been almost three years. If they had evidence during that time... Amarin did say it would make it harder to attract capital. Amarin said they were not reaching the merits of those questions. They raised them as issues and sent them back to the commission. The court was very clear, page 880, F3, 582, that they were not reaching the merits. And the court also said in Amarin that they understood that investors invest on the entire enterprise, not particular portions. I agree with you that Amarin said we're not reaching the merits. But I think I did understand them to say, though it may still possibly be a just rate to do generator funding, it is going to make it harder to attract capital. I think where you can link Amarin in this case, which are essentially mirror images. In Amarin, you had transmission owner self-funding in the tariff. There was an effort to dislodge it. In this case, you have participant funding in the tariff. An effort is being made to dislodge it. What links them is evidence. That's what this case is really about. Is there any showing here that these transmission owners are facing real financial distress under the currency? Do you disagree with Commissioner Danley's statement? I'll read it here. While it may be difficult to assess with precision the risk assumed by a transmission owner operating a system upgrade, the one thing we do know is that it is not riskless. It cannot be. Does that seem right? Might there be a risk in adding facilities to your system? There could be. And then if there could be, it seems like that almost by definition makes it at least a teeny bit harder to attract investment. But you have to make a showing to that effect. You have to demonstrate that there's that problem. These transmission owners have made no showing on this record that they are facing any risk attracting capital. And I'm not saying that this means you lose. No, no, I get it. But it does seem like you don't need to make a showing of what seems like a pretty basic economic concept, which is if there's going to be some increase in risk, which is conceded, then it will be somewhat harder to attract investment. And if you can make that showing, or if it's obvious, then you have a route to change your return. You have a route to try to take. You have a remedy. They are not without a remedy here. It's just not the one that they're seeking. I'd also tell you that while they're here, to seek a return, a change in their return on equity, an attempt to demonstrate. 205. Oh, absolutely. And they haven't done that in this 205 filing? They have not. They have sought to change the rate design here to allow them to make investments on which they will earn the existing return on equity. They haven't asked to adjust the return on equity. I'll check that. You don't think they made an alternative? Not to my knowledge. No, sir. No, sir. The other thing I want to point out is that while expressing concern here about the risk they are facing, the fact is that the New York climate law will require them to build additional amounts of planned transmission. And far from touting the risks, they are touting the benefits. The transmittal letter to their 205 filing, in this case, that's in the appendix at page 10, refers to the need for there to be a significant expansion of the transmission grid to integrate renewables. I'm sorry. That's at page 8. At page 10, they say they are committed to incorporating clean energy drivers into their transmission capital planning to ensure that their local transmission networks can meet the needs. What this means is that they are going to engage in substantial planned transmission, which they will fund, they will invest in, they will put in an investment base, and they will earn a return on. And I called the court's attention to the brief from my colleague from the American Clean Power Association at page 14. They referenced testimony that Petitioner Con Edison informed the Securities and Exchange Commission in 2020 that it had identified $4.5 billion in local transmission investment that would be needed to meet the goals of the climate. Those investments, to the extent they are planned, they are going to go into rate base. And to the extent that they overhaul the transmission system, which they say in their brief at page 6 is needed, they're going to spend money on investing in facilities to meet the new needs. Why are those not system upgrades that the generators are responsible for? Because they're going to plan the system to meet the needs in advance. If they do it correctly, they do their job right, and they right-size the system correctly, the need for these interconnection-related upgrades should be minimized. I also want to point out, Council mentioned during the argument something about a 1,200% increase in interconnection upgrades or requests or something along those lines. I note that there's a graph in their brief at page 7, I believe, that shows that there was something like $1.2 billion in interconnection-funded upgrades in 2019. In fact, FERC had asked them in the deficiency letter to say that was an estimated number. What was the final number? The final number was actually about a quarter of that, or $300 million. That's not an insignificant number. But if you look at the overall picture of their risk profile, as FERC did, there's no evidence to indicate that their return is too low or they otherwise are facing financial distress. Just a quick question about Commissioner Danley. About Commissioner Danley himself? Whether it be his opinion. Oh, his opinion, yeah. And whether, because I think, I just wanted you to tell me if this is right, because I think your fundamental point is that perhaps there is a marginal risk that goes up, and perhaps then they should be able to increase their return on investment. They could make that showing. But most importantly, that's not what they're asking for.  They're asking for a change to the rule to ask for a new investment.  And Danley did not say he thought they should be able to do that. Right, right. And remember that what we're talking about here is essentially a technical matter of electricity rate design, which the Supreme Court has said in FERC v. EFSA is something on which the Commission gets a great deal of deference. Thank you, Your Honors. Thank you, Counsel. Good morning. Is it Tabak? Tabak, Your Honor. Tabak. Mr. Tabak. Good morning, Your Honors. May it please the Court. Gabriel Tabak on behalf of the Generator Intervenors. Your Honors, I wanted to briefly hit two points that reinforce those that have already come forward in the discussion today, both of which are linked to what the New York Transmission Owners are actually disclosing to their investors, and because of that, speak to whether they have met their burden of proof under Section 206. The first is that the disclosures to investors of any risks related to system upgrades by the Transmission Owners are only at a generalized level. I would refer the Court to the testimony of our witness, Michael Goggin, beginning at JA 513. None of the examples that the Transmission Owners have cited in their testimony actually have anything to do with a system upgrade specifically. These are examples of broad categories of risks that utilities in New York or elsewhere may have been responsible for, but none of them are specifically linked to the category of facility that they are, before the Court, discussing today. It's really a generalized risk faced by the overall enterprise. The second point, which is related to that, is that the transmission system operates as an integrated whole. The Transmission Owners and the New York Independent System Operator have the responsibility of running the whole system from the lower-voltage facilities to the higher-voltage facilities, from Niagara Falls to New York City, as an integrated whole. But from a capital- and rate-based perspective, it's actually more of a quilt. There are different aspects of the system that can operate with different rates of return. The Commission cited one in their brief, which are contributions in aid of construction, which the Commission has always held that if a utility receives a contribution, maybe of land from a municipality to help build a substation or transmission line, that is not included in the rate base. There could be network upgrades that generators fund. There could be fully depreciated assets, which are no longer included in rate base after they're depreciated. And, as my colleague from New York indicated, there can be large-scale planned transmission. Each of those things may have a different role in the capital structure and whether they're included in the rate base, which really means that the relevant discussion here is regarding what the overall enterprise risk profile is. The ROE, as the Commission rightly noted, is the way that stitches together those pieces of the quilt and assesses whether the enterprise as a whole is healthy. And I think, to Judge Walker's questions regarding Ameren, I think the court's concern there was whether, I guess, stretching the metaphor too far, one piece of that quilt could become oversized and skew it, and that, again, circles back to the Section 206 burden here and the fact that the transmission owners have not disclosed any material risk, and, indeed, as my colleague from New York noted, the only reference to the state policy drivers that are pushing forward the major grid changes in New York, the only references that are expressly made to investors here are regarding the investment opportunities that occur from this large planned transmission. I'd refer the court there to JA 518 and 519 and JA 491. In our protest before FERC, we identified two of the New York transmission owners. I believe one of them was the $4.5 billion. Another was another $400 billion, so $4.9 billion that is being disclosed to investors from the same source that is spurring the need for network upgrades in New York, but the network upgrades are not specifically mentioned at all. They are only rolled into these generalized categories of risk. For those reasons, the commission rightly found that petitioners had not met their Section 206 burden. Thank you, counsel. Thank you, Your Honor. Mr. Tompkins, we'll give you three minutes. Thank you, Your Honor. Judge Garcia, to go back to the question you asked about the record evidence, Mr. Novak's testimony that the current ROE doesn't account for the system upgrade risk. I think you found it because you quoted something when Mr. Perkins was here, but it is Joint Appendix 649 through 650. Judge Walker, you asked Mr. Perkins about FERC's precedent for including such assets or such risk in ROE. In response to that, I would just like to read this quote. Quote, the commission in the Ameren remand orders found that transmission owners do, in fact, have at least some uncompensated risk when forced to operate network upgrades paid for through generator funding. This is consistent with the Ameren court's finding that FERC's precedents do not provide compensation for several classes of risk that transmission owners allege will accompany construction and operation of the network upgrade facilities. The existence of such uncompensated risk supports the transmission owners' basic contention that they are entitled to be compensated now for operating the upgrades. That quote is from FERC's brief to this court in the American Clean Power Association case. It seems like there has been remarkable unanimity today for the proposition that if you think that your rate of return is becoming too low in light of these increased risks that you are forced to bear from generator-funded upgrades, you can seek an adjustment in your rate of return through a 205 filing. Yes, we believe that's correct. Did your current 205 filing, which is before us, ask for that relief in the alternative? It asked for an adjustment of the rate of, excuse me, the return on investment. It did not ask to adjust the ROE, the return on equity component of that. But it did ask to adjust the rate base. Rate base only. Rate base only, which is a component of return on investment. That seems at least partially incomplete. It asked for a change in the rules so you could make new investments to increase your rate base. The only way to change the rate base is to ask to make the new investments. That's the problem here is that we can't put the existing system upgrades into rate base. We can only do this prospectively. So the only way to change, there are multiple ways, I guess, we could change return on investment. One would be to, because return on investment is a mathematical formula, right? It's weighted average cost of capital times rate base. So to change the return on investment, we could ask to change one of those components, both of those components. We asked to change the rate base part of that. But not return on equity. Not return. We did not ask, because it's FERC technology, that was a new concept. It came out of their orders in this case. That was not an option that had previously been in any FERC order. But the return, the rate base adjustment is traditionally how these risks are accounted for. As Mr. Perkins said, the system upgrades become part of the transmission system and are just like every other asset, every other facility on that transmission system carrying the same risks. The risk of every other facility is in rate base. And that's why there's this mismatch to put it in, to put these specific facilities into ROE. And this is a significant problem. In 2019, system upgrades accounted for 7% of the total transmission plan. If all $1.2 billion had been approved, that would eclipse that entire 7%. It would be more than double it. The $300 million that ultimately were implemented in 2019, you increase that percentage by over 2%. I think the 7% was around $900 million in system upgrades. So the $300 million is another 1 third. And that's continued to increase. And we expect it to continue to increase in the future. I'll just end with this. In the Ameren oral argument, when FERC said that there was no harm to utilities, Judge Silberman said this is an attack on the business model. First, you take it finger by finger, and then you take it arm by arm. That's where we are. At this point, the arms are being taken. Thank you, Your Honors. Can I ask a kind of more technical question? That was a very strong, emphatic conclusion. But the two concerns that Judge Katsas raised that I think were inspired by concerns that you and the intervener raised, one was the retroactivity problem, one was this will be cost-shifting to the wrong customers problem. Are those identified in your brief and in the intervener petitioner's brief or not? I think the concepts are definitely there, but that's a step-two problem. The issues before this court, in our view, are step-one problems. In 205, it's whether we have the filing rights. And then step-two would be debating whether our proposal was reasonable. The 206, the question is, is it unjust and reasonable or discriminatory? If so, what's the replacement rate? What's the good solution? I think the retroactivity goes to that question about, is ROE even possible as a solution? We don't think we ever got there, which is why we need to remand to FERC to have that debate. I appreciate that. And sorry for stepping on your mic drop. Thank you. Thank you. Case is submitted.
judges: Katsas; Walker; Garcia